OPINION *Page 2 
{¶ 1} This is a prosecutor's appeal in a capital murder case. Appellee Terrance Tate was indicted for the murder of a child who died from blunt force injuries. Shortly after the child was injured, but while he yet lived, Appellee was called to the police station and was taken to an interrogation room for questioning in this matter. The police did not administer Miranda warnings. During the interrogation, Appellee admitted that he had given the child "body blows" in the past. The interrogation stopped, a videotape recorder was turned on, and police notified Appellee of his Miranda rights. Appellee waived his rights, and allowed the interrogation to continue. During the subsequent questioning, Appellee made further incriminating statements about hitting J.C., the victim. The police arrested Appellee. The child later died from his injuries, and Appellee was charged with capital murder. Appellee filed a motion to suppress the statements made at the police station. The motion was sustained by the trial court, and the state initiated this appeal.
 {¶ 2} The state concedes that Appellee was not given a Miranda warning until after he had confessed to hitting J.C. The state claims that Miranda warnings were not required prior to this confession because there was no custodial interrogation taking place. The state argues that Appellee was not in custody because he was free to leave at any time. However, the record supports the trial court's findings and conclusion that a reasonable person would not have felt free to leave under the circumstances. The state also argues that there was no interrogation because no aspect of the questioning was designed to elicit incriminatory answers. Again, the record does not support this conclusion. The record reflects that the *Page 3 
police were loudly swearing at and threatening Appellee during questioning, and asking him specific questions about the crime. Finally, the state argues that Appellee's post-Miranda statements dealt with a different subject than his pre-Miranda statements, and that those latter statements should not be excluded as "fruit of the poisoned tree." The record reflects that pre- and post-Miranda interviews constituted one continuous interrogation, and any statements that Appellee made during the entire interrogation were properly excluded from trial. The trial court made certain determinations as to the credibility of several witnesses to the detriment of the prosecution, and these have support in the record. Appellant has not established reversible error in this appeal, and the judgment of the trial court sustaining Appellee's motion to suppress must be affirmed.
 HISTORY OF THE CASE {¶ 3} On April 26, 2006, April Ford took her one-year-old son, J.C., to St. Elizabeth Hospital in Youngstown. J.C. had sustained multiple blunt force injuries. Appellee and his friend, Jamar Spivey, also were present. Ford told hospital officials that J.C. had fallen down some stairs. Hospital officials called the police due to the suspicious nature of the injuries. Officers arrived and questioned Ford. During the questioning, she told police that Appellee hit J.C. during the evening of April 25th and the morning of April 26th. Police took Ford to her apartment to collect evidence and take photographs. Evidence included Appellee's shirt and blood samples.
 {¶ 4} Police attempted to locate Appellee. They contacted Betty Badie, Appellee's mother. Police drove Badie to the police station. After arriving at the *Page 4 
station, she was told to call Appellee on her cellular phone. Youngstown Detective, Lt. Mark Edward Milstead, took the phone and told Appellee that the police needed to ask him some questions, and that if he did not come to the station, 100 task force officers would be out looking for him. Lt. Milstead did not specifically say that Appellee was a suspect or would be placed under arrest if he came to the station. Badie called her son a second time from the police station, and Lt. Milstead again took the phone and told Appellee he was taking too long to arrive at the station.
 {¶ 5} Soon after Appellee arrived at the police station, he was escorted to the fourth floor. His friend Jamar Spivey was with him, but Spivey was taken to a separate room. Spivey's girlfriend tried to leave the police station in Spivey's car, but she was stopped by the police and the car was confiscated. Appellee's mother and grandparents were also at the station when Appellee arrived.
 {¶ 6} Police took Appellee to an interrogation room. There were pictures of Appellee on the table. Three officials were in the room: Lt. Milstead; Detective Sergeant Rick Spottleson; and Detective John Patton. The officers began questioning Appellee, and during the questioning Appellee said that he had given the child some body blows in the past while he was playing with J.C. The police then stopped the questioning, informed Appellee of his Miranda rights, and turned on videotaping equipment. Appellee waived his right to remain silent and to have an attorney. Police continued to interrogate Appellee, and during this subsequent interrogation he admitted that he had hit J.C. the previous evening. Appellee was arrested for felonious assault. The child died shortly thereafter. *Page 5 
 {¶ 7} Appellee Terrance Tate was indicted by direct presentment on May 4, 2006, on one count of aggravated murder with a death specification. On October 27, 2006, Appellee filed a motion to suppress the statements made at the police station. The suppression hearing took place on March 1-2, 2007.
 {¶ 8} Lt. Milstead testified at the suppression hearing that he went to the hospital on April 26th due to suspicious injuries reported in the case of J.C. He spoke to the child's mother, April Ford, who initially told him that J.C. had fallen down some steps. During later questioning, Ford told him that Appellee had struck the child numerous times. (Tr., pp. 33-34.) Despite Ford's comments, Lt. Milstead testified that Ford was the primary suspect in the case and that Appellee was not initially considered to be a suspect.
 {¶ 9} Lt. Milstead testified about the interrogation of Appellee later that day at the police station. He stated that the discussion with Appellee in the interrogation room did not get heated; that nobody raised their voices, screamed, swore, or called Appellee a liar. Lt. Milstead said he did tell Appellee to tell the truth a number of times.
 {¶ 10} Lt. Milstead testified that the door to the interrogation room was open until they Mirandized Appellee. After giving him his Miranda rights, they turned on the videotape equipment.
 {¶ 11} Lt. Milstead said that there was no arrest warrant issued for Appellee prior to his arrival at the police station, and that there was no probable cause to arrest him when he came to the police station. *Page 6 
 {¶ 12} Lt. Milstead testified that Appellee was questioned for five or ten minutes before he made a statement saying that he had given J.C. "body shots" in the past. Appellee demonstrated to the detectives the manner in which he would punch J.C. in the ribs. According to Lt. Milstead, Appellee's statement about "body blows" elevated him to a suspect in the case. The interview was stopped at this point, Appellee was given his Miranda rights, and the videotape was turned on. Appellee was then also told that he was not free to leave.
 {¶ 13} Det. Spottleson testified that he talked to various family members at the hospital, including the child's grandmother and aunts. He was told that the baby had fallen down steps, but he was also aware that the injuries were not consistent with a fall. He and Det. Patton took April to her apartment, located in the projects at Westlake, Apartment 214. Then they took April to the police station, along with her 7-year-old daughter. Det. Spottleson saw Appellee at the police station, and he knew that April had implicated him in one of her statements. Det. Spottleson considered Appellee as a person of interest in the case. He testified that the Mahoning County Task Force was notified that Appellee was a person of interest in the case, and they were to watch for him. He testified that the interrogation room door was open when they questioned Appellee. (Tr., p. 136.) He described the questioning as very informal, with people walking in and out, and with Appellee's grandmother nearby.
 {¶ 14} Det. Spottleson testified that one of the officers asked Appellee two questions: "did April hit the child" and "have you ever seen anybody else hit the child". (Tr., p. 120.) Appellee then stated that he had given the child body blows in *Page 7 
the past. The police stopped the questioning at this point and told him he could not leave. The police Mirandized him, and turned on the videotape. They had not made up their mind to arrest him at this point, because his comment seemed to be in reference to a prior assault, not to the child's present injuries. Nevertheless, Det. Spottleson testified that when Appellee made this statement, he became a suspect in this case. According to Det. Spottleson, Appellee never confessed to killing J.C. or to inflicting any blow that caused the child's death.
 {¶ 15} Det. Spottleson testified that no one ordered or forced Appellee to come to the police station to make a statement. April Ford was the main suspect, according to Det. Spottleson. He testified a number of times that Appellee was not a suspect when he walked into the police station.
 {¶ 16} Det. Spottleson testified that, after Appellee was Mirandized, he confessed that he had hit the child the previous evening.
 {¶ 17} Det. Spottleson further testified as to his interviews with April Ford. Ford told him that she was awakened on April 26 by Appellee, who was screaming at her child. (Tr., p. 109.) Appellee hit the child in the face 10 to 20 times, and 3 or 4 times in the chest. (Tr., p. 110.) Det. Spottleson testified that the police had this information before questioning Appellee. (Tr., p. 110.) Det. Spottleson said that Ford heard Appellee slam the victim into the door or wall of the bathroom, and this information was also conveyed to the police before Appellee was questioned. (Tr., p. 112.) Ford further reported to Det. Spottleson that Appellee hit the child with a belt, *Page 8 
and slammed the child's head against the closet door. Appellee also screamed obscenities at the child and said "I ain't your fucking father." (Tr., p. 113.)
 {¶ 18} According to Det. Spottleson, the police gave Appellee's name to the Violent Crimes Task Force, but they were not told to arrest him. (Tr., p. 114.) The police also went to April Ford's apartment and took a bloody tee shirt belonging to Appellee. They had this bloody tee shirt prior to questioning Appellee.
 {¶ 19} Appellee's friend, Jamar Spivey, was at Ford's apartment on April 26, 2006, along with Appellee. Spivey drove the child to the hospital on April 26, 2006. He said the baby was blue and was not breathing. Appellee and Ford were also in the car.
 {¶ 20} Spivey later heard Betty Badie call Appellee on his cellular phone and tell him to come to the police station and turn himself in. (Tr., p. 229.) He also said that detectives called Appellee and said they wanted Appellee to turn himself in because of what happened to J.C. (Tr., p. 230.) Badie called again from the police station and said the police were not going to release her until Appellee went to the police station. (Tr., p. 232.) Spivey and Appellee arrived at the police station about 15-20 minutes later. Spivey's girlfriend was also in the car; she dropped the two off at the station. Appellee's mother, grandmother and grandfather were there. The police immediately took Appellee to an interrogation room. Spivey was placed in another room with Badie. He said that police confiscated his vehicle immediately after he entered the police station. *Page 9 
 {¶ 21} Spivey heard raised voices coming from Appellee's interrogation room, lasting 20 to 30 minutes. Police then escorted Spivey to a different interrogation room and questioned him for 45 minutes.
 {¶ 22} Betty Dow, Appellee's grandmother, testified that Betty Badie called her from the police station and said she was not allowed to leave. Betty Dow and her husband went to the station. Appellee called her while she was at the station. During their time there, she was asked to go into the interrogation room where Appellee was being questioned. She was there during part of the questioning, but the police said they were not getting the answers they wanted, and she was asked to leave the room. She testified that the door to the interrogation room was closed and that the police were screaming at Appellee.
 {¶ 23} Tenesha Hollinshead (girlfriend of Jamar Spivey) testified that she was in the car with Spivey and Appellee. She testified that Appellee received a cellular phone call from his mother, and she heard a police detective ask Appellee to come to the police station for questioning. The cellular phone was on speakerphone mode at the time. She also heard another cellular phone call from Betty Badie to Appellee. Badie said the police had her and would not release her until Appellee came to the station. (Tr., p. 275.) Hollinshead heard Appellee say that he would go to the police station because he knew why they were holding his mother. She drove Spivey and Appellee to the police station. While she was looking for a parking space, an unmarked police car pulled her over. The police told her they were confiscating the car, so she walked back to the police station. (Tr., p. 278.) *Page 10 
 {¶ 24} She went to the floor of the police station where the police were interrogating Appellee. She heard the police screaming at Appellee, telling him he was "fucking lying," and heard, "I am going to fucking put you under the jail." (Tr., p. 279.)
 {¶ 25} Appellee testified that his mother called him on his cellular phone and said the police needed him to come in for questioning. He did not plan to go to the police station at this time. He received a second call from his mother, Betty Badie. This time she said that the police would not release her unless he came to the station and talked to a detective. (Tr., p. 300.) A detective then was on the line and told Appellee it was a very serious matter and that he needed to come in for questioning. The detective said that if he did not come to the station, "I will send police out to look for you." (Tr., p. 301.) The detective said he would send 100 officers to look for him. (Tr., p. 301.) Appellee did not know how his mother ended up at the police station. Appellee testified that he received a third phone call a few minutes later. It was a detective using his mother's cellular phone. The detective asked if Appellee was coming, and that he knew what kind of car his friend Spivey was driving. The detective also told him that he, "might have a warrant for [his] arrest." (Tr., pp. 303-304.) Appellee identified the voice as that of Lt. Milstead.
 {¶ 26} When Appellee arrived at the police station, a detective was waiting for him. He saw his mother, but he was not permitted to speak with her or any other family member. One of the police officers said Appellee smelled like marijuana, and an altercation occurred. The police took him to an interrogation room, and Appellee *Page 11 
saw photographs of himself spread out over the table. These photographs had been in Spivey's car just a few minutes earlier. He said a bald-headed policeman was in the room with another officer, and the officer who brought him to the room stayed as well. Appellee identified Lt. Milstead and Det. Spottleson as two of the people in the room. They asked him his name and birth date, and wanted him to explain how he knew April Ford. He said he "messed around" with April from time to time, and took care of her children. Then they asked about J.C.'s injuries. He testified that no one had yet read him his Miranda rights.
 {¶ 27} After five to ten minutes, his grandmother entered the room. After a few minutes, they escorted her out of the room again. After she left, the police shut the door. (Tr., p. 320.) Appellee said there was a significant change in the attitude of the police officers after this. The police became very aggressive, standing directly in front of Appellee's face, pointing and cursing. The police asked him if he wanted to see April go to jail. He said no. They said that a witness named Anaya told them he had caused the injuries to J.C. Appellee said that Anaya was not involved. The police said they had fingerprints taken from the baby, and he said that was a lie. They told him he was "fucking lying" and he said he was not. He thought that this interrogation lasted about 45 minutes to an hour. During the interrogation, he told them that he would play with the baby, and he showed them what he would do with his fists to play with the baby. The police said that his fist action could not have caused all the injuries, and asked Appellee to tell them more. One of the detectives *Page 12 
then said that he had charged Appellee with felonious assault, and that if he "took a plea" he would be released in a very short time.
 {¶ 28} After this, the police read Appellee his Miranda rights and turned on a video camera.
 {¶ 29} Appellee testified that he was never left alone in the interrogation room without a police officer, and that he was not permitted to speak to any family member other than his grandmother.
 {¶ 30} The trial judge took the motion to suppress under advisement, and allowed the parties to file post-hearing briefs.
 THE TRIAL COURT'S JUDGMENT ENTRY {¶ 31} On August 1, 2007, the court sustained the motion to suppress. The trial judge made a number of findings in his seven-page judgment entry. The court found that J.C. was brought to the hospital with suspicious injuries. Lt. Milstead and Det. Spottleson were called to the hospital. They spoke with April Ford, and after fifteen minutes, she divulged that Appellee was responsible for the child's injuries. The police asked Appellee's mother, Betty Badie, to go to the police station, and they would not let her drive her own car. After they arrived at the station, Lt. Milstead asked Badie to call Appellee. She called him more than once. Lt. Milstead told Badie to convince Appellee to come to the station. Lt. Milstead told Badie to say that they had reason to believe he was at Ford's apartment when the child was injured. The police also told Badie she could not leave until her son got there. Lt. Milstead *Page 13 
talked to Appellee on Badie's cellular phone, and said 100 Task Force members were looking for him.
 {¶ 32} The judgment entry states that certain facts appeared to weigh against a conclusion that Appellee was in custody at the police station: his friend drove him to the station; he was not formally placed under arrest or handcuffed when he arrived; and the police testified that he was free to leave, at least until he made the incriminating statement about "body blows." Other facts weighed in favor of a finding that Appellee was actually in police custody: Appellee only went to the station after his mother called him several times, and that she was not free to leave until he arrived; his mother was brought to the police station by Task Force members rather than being allowed to drive herself; and Appellee knew that 100 Task Force members were looking for him. The judge specifically did not believe the testimony that Task Force members were told not to arrest Appellee if they found him.
 {¶ 33} The judge concluded that a reasonable person in Appellee's position would have thought he was in custody and could not leave the police station.
 {¶ 34} The judge also determined that an interrogation took place because the police asked specific questions about the crime rather than simple routine booking questions.
 {¶ 35} The judge found that the police considered Appellee to be a suspect from the time that April Ford told them that Appellee had slapped and struck the child earlier that day. The judge stated that he did not believe the testimony of the police officers on this issue. *Page 14 
 {¶ 36} Finally, the judge found that Appellee's post-Miranda statements merely confirmed Appellee's earlier statements. For these reasons, the trial judge concluded that all of Appellee's statements from the entire interrogation process must be suppressed.
 {¶ 37} On August 2, 2007, the state filed this appeal.
 STANDARD OF REVIEW {¶ 38} The state is appealing the trial court's decision on a motion to suppress statements Appellee made in the police station. The standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence. State v. Winand (1996), 116 Ohio App.3d 286, 288,688 N.E.2d 9. This is a highly deferential standard of review because, "`[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.'" State v.Hopfer (1996), 112 Ohio App.3d 521, 548, 679 N.E.2d 321, quotingState v. Venham (1994), 96 Ohio App.3d 649, 653, 645 N.E.2d 831. If there is competent and credible evidence supporting the trial court's findings, the reviewing court must independently determine as a matter of law whether the trial court met the applicable legal standard or standards. State v. Williams (1993), 86 Ohio App.3d 37, 41,619 N.E.2d 1141.
 ASSIGNMENT OF ERROR NO. 1 {¶ 39} "The trial court had neither competent nor credible evidence to determine that Mr. Tate was in Miranda Custody." *Page 15 
 {¶ 40} A suspect in police custody, "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda v. Arizona (1966), 384 U.S. 436, 479, 86 S.Ct. 1602,16 L.Ed.2d 694.
 {¶ 41} The right to Miranda warnings is grounded in the Fifth Amendment's prohibition against compelled self-incrimination. Moran v.Burbine (1986), 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410. Police are not required to administer Miranda warnings to every individual they question. State v. Biros (1997), 78 Ohio St.3d 426, 440,678 N.E.2d 891. Only custodial interrogations trigger the need for Miranda warnings. Id., citing Oregon v. Mathiason (1977), 429 U.S. 492,495, 97 S.Ct. 711, 50 L.Ed.2d 714.
 {¶ 42} An individual is in custody for purposes of Miranda when there has been a formal arrest or when the person's freedom of movement is restrained such that a reasonable person in the suspect's position would believe that he or she is under arrest. State v. Petitjean (2000),140 Ohio App.3d 517, 523, 748 N.E.2d 133; Berkemer v. McCarty (1984),468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317. A police officer's subjective view of whether the person is in custody is not relevant to the analysis. Stansbury v. California (1994), 511 U.S. 318, 319,114 S.Ct. 1526, 128 L.Ed.2d 293. *Page 16 
 {¶ 43} There does not seem to be any dispute in this case about when the police first read Appellee his Miranda rights. Appellee arrived at the police station on April 26, 2006, was taken to an interrogation room, and was questioned for a relatively short period of time. Appellee made a statement about hitting J.C. with "body blows," and the interrogation stopped. It was at this point that the police recited to Appellee his Miranda rights. This and the next assignment of error are premised on the idea that Miranda warnings were not needed prior to the initial police questioning because Appellee was not in "custody" as defined by the caselaw stemming from Miranda v. Arizona.
 {¶ 44} Miranda warnings are not required simply because questioning takes place in a courthouse or police station. California v.Beheler (1983), 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275. A court must look at the totality of the circumstances in order to determine whether an individual is in custody at any given time. Id. at 1125.
 {¶ 45} The Second and Third District Courts of Appeals have adopted a ten-factor, non-exclusive test to determine when a person is in custody for purposes of Miranda:
 {¶ 46} "1) What was the location where the questioning took place — i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station; *Page 17 
 {¶ 47} "2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);
 {¶ 48} "3) Was the defendant's freedom to leave restricted in any way;
 {¶ 49} "4) Was the defendant handcuffed or told he was under arrest;
 {¶ 50} "5) Were threats made during the interrogation;
 {¶ 51} "6) Was the defendant physically intimidated during the interrogation;
 {¶ 52} "7) Did the police verbally dominate the interrogation;
 {¶ 53} "8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;
 {¶ 54} "9) Were neutral parties present at any point during the questioning;
 {¶ 55} "10) Did police take any action to overpower, trick, or coerce the defendant into making a statement." State v. Estepp (Nov. 26, 1997), 2nd Dist. No. 16279, *4; see also, State v. Greeno, 3rd Dist. No. 13-02-46, 2003-Ohio-3687.
 {¶ 56} Appellant places primary significance on one single factor in this case: whether the interrogation room door was initially open or closed. While there is conflicting testimony about this matter, there is no caselaw supporting that this one factor has any decisive bearing on reviewing the totality of the circumstances of custodial interrogation.
 {¶ 57} It is difficult, if not impossible, to interpret the evidence in support of the state's argument in this appeal. It is true that the police officers involved in *Page 18 
interrogating Appellee stated many times during the suppression hearing that he was not a suspect, that he was free to leave at any time, and that he came to the police station of his own accord. The record, however, reveals overwhelming evidence to the contrary. Following a brief examination of the ten factors listed, we must conclude as did the trial court that the evidence weighs heavily in favor of the conclusion that Appellee was in custody for purposes of Miranda law.
 {¶ 58} The first factor to consider is the location of the interrogation. The record shows that the interrogation took place at the police station in an interrogation room, rather than in a neutral location.
 {¶ 59} The second factor concerns whether Appellee was a suspect. The trial court found that he was, and Det. Spottleson's testimony particularly emphasizes this fact.
 {¶ 60} The third factor is whether Appellee was free to leave. The record shows that the interrogation room door was closed (according to Betty Dow and Appellee, and even admitted on cross-examination of Det. Spottleson). More importantly, it was clear that Appellee's mother was being held in some type of informal custody until Appellee satisfied the police with certain answers. Appellee also had no transportation away from the police station because Jamar Spivey's car had been confiscated.
 {¶ 61} The fourth factor is whether Appellee was officially placed under arrest or put in handcuffs. Neither of these occurred until after the initial questioning had already concluded. *Page 19 
 {¶ 62} The fifth factor has us consider whether threats were made. The record indicates that the police were screaming at Appellee, calling him a liar and threatening him with arrest and prison; at one point telling him that the police would put him "under" the jail, which could be viewed as a threat.
 {¶ 63} The sixth factor looks at whether physical intimidation took place. In this case, physical intimidation included screaming, swearing and shaking a finger directly in Appellee's face. The fact that three policemen performed the interrogation together might also be interpreted as a form of physical intimidation.
 {¶ 64} The seventh factor is the use of verbal domination. There was evidence of substantial verbal abuse, screaming, swearing, and calling Appellee a "fucking liar".
 {¶ 65} The eighth factor concerns a defendant's purpose for being at the location where the interrogation took place. Appellee went to the police station specifically so that the police could interrogate him, and partly so that Appellee could procure the release of his mother.
 {¶ 66} The ninth factor deals with whether neutral parties were present during questioning. Appellee's grandmother was present for only a few minutes during the early part of the interrogation. Otherwise, only Appellee and the three officers were in the interrogation room.
 {¶ 67} The tenth factor looks at whether the police tried to overpower, trick or coerce the defendant into talking. The record discloses ample evidence of this. The police repeatedly called Appellee a liar and told him his answers were not what they *Page 20 
wanted to hear. They asked him if he wanted April Ford to go to jail, and if not, he should give them better answers. They made him aware that his mother was being held because he was not talking to the police. When he told them about the "body blows," they said that he needed to give them more information, since the child had some injuries that were not consistent with body blows.
 {¶ 68} Only factors four and nine might be seen to weigh in favor of Appellant's argument. Once we accept the trial court's credibility determinations, as we must, the remaining factors strongly support the trial court's conclusion that Appellee was in custody when he was questioned about the injuries to J.C. The record contains competent and credible evidence supporting the conclusion that Appellee was in custody, as defined by Miranda jurisprudence, and this assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. 2 {¶ 69} "The trial court had neither competent nor credible evidence to determine that the police subjected Mr. Tate to a Miranda interrogation."
 {¶ 70} Miranda defined custodial interrogation as, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, at 444. Interrogation includes express questioning as well as its "functional equivalent," which refers to, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis *Page 21 
(1980), 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297. Whether or not an interrogation has taken place focuses, "primarily upon the perceptions of the suspect, rather than the intent of the police." Id.; see also Illinois v. Perkins (1990), 496 U.S. 292, 296, 110 S.Ct. 2394,110 L.Ed.2d 243.
 {¶ 71} The state argues that police are only prohibited from asking questions that, "are designed to elicit incriminatory admissions," quoting Pennsylvania v. Muniz (1990), 496 U.S. 582, 602,110 L.Ed.2d 528, 110 S.Ct. 2638, fn.14. The state contends that the specific question prompting Appellee's incriminating answer was not designed to incriminate Appellee. Det. Spottleson testified that, "[t]he question that was asked was did anybody — have you ever seen anybody strike the child." (Tr., p. 83.) The state argues that this question was designed to find out if anyone other than Appellee had struck the child. Appellee, though, responded by admitting that he himself struck the child with light blows in the past. We cannot agree with the state's reasoning. If we accept Det. Spottleson testimony at face value, the question that was asked was very broad, using the word "anyone," which would include Appellee. Thus, the police specifically asked Appellee to give them information about any person — including Appellee — who hit the child.
 {¶ 72} There seems to be little question that Appellee was subject to custodial interrogation, in the Miranda sense, by the police on April 26, 2006. Appellee was asked specific questions designed to find out who committed the crime; was pressured into giving answers because his mother was held in some type of informal custody at the police station; interrogators screamed, cursed at and threatened him; *Page 22 
and the police even brought Appellee's grandmother into the interrogation room in an attempt to garner a confession from him. Miranda warnings exist to protect citizens from just these types of coercive situations. Therefore, Appellant's assignment of error is not well-taken and is overruled.
 ASSIGNMENT OF ERROR NO. 3 {¶ 73} "The trial court had neither competent nor credible evidence to determine that Mr. Tate's post-Miranda statement was the fruit of a Fifth Amendment-violative pre-Miranda statement."
 {¶ 74} The thrust of this assignment of error is that any statements made by Appellee before he was given his Miranda warnings were not related to the same crime as the crime to which he confessed after he was given his Miranda warnings. The state contends that his pre-Miranda confession referred to some type of assault prior to April 26, 2006, whereas his confession afterward referred specifically to the fact that he struck J.C. on or about April 26, 2006. Appellant contends that, since the information in the confessions was different, the latter confession did not derive from the earlier tainted confession, was not the "fruit of the poisonous tree," and should not have been suppressed.
 {¶ 75} The controlling case regarding whether subsequent confessions are admissible, after a Miranda violation has already taken place, isMissouri v. Seibert (2004), 542 U.S. 600, 124 S.Ct. 2601,159 L.Ed.2d 643. In Seibert, the United States Supreme Court considered whether the technique of successive interrogations, first unwarned and then warned, violates a defendant's Miranda rights. In Seibert, an *Page 23 
officer questioned the defendant without Miranda warnings for 30 to 40 minutes. The defendant made an admission, and the officer stopped the interrogation for 20 minutes. The same officer came back, gave the defendant Miranda warnings, obtained a signed waiver, and resumed questioning. The officer confronted the defendant with her pre-Miranda statements. The defendant repeated her admission. The Court referred to this interrogation technique as "question first" and stated that, "[t]he object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 611, 124 S.Ct. 2601,159 L.Ed.2d 643. The Court held that these postwarning statements were inadmissible. Id. at 617, 124 S.Ct. 2601, 159 L.Ed.2d 643.
 {¶ 76} The Seibert Court identified, "a series of relevant facts that bear on whether Miranda warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615, 124 S.Ct. 2601, 159 L.Ed.2d 643.
 {¶ 77} Seibert points out that in "question first" scenarios, the post-Miranda warning statements are inadmissible because, "the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." Id. at 612, 124 S.Ct. 2601,159 L.Ed.2d 643, fn. 4. *Page 24 
 {¶ 78} In contrast to Seibert, a much earlier United States Supreme Court case had concluded that, in some "question first" situations, post-Miranda confessions could be admissible. In Oregon v. Elstad
(1985), 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222, police went to the home of an 18-year-old defendant with a warrant for his arrest. While one officer went to the kitchen to explain to the suspect's mother that her son was being arrested for the burglary of a neighbor's residence, another officer stayed with Elstad in the living room and had a brief discussion with him. The officer explained that the neighbor's house had been robbed and that he thought Elstad was involved. Elstad stated to the officer, "Yes, I was there." Elstad, 470 U.S. at 301,105 S.Ct. 1285, 84 L.Ed.2d 222. Police took Elstad to the sheriff's department, and about one hour later, interviewed him in the office of one of the officers. The police administered Miranda rights for the first time without mentioning Elstad's previous statement. Elstad waived his rights and then made a full statement. He confessed that he knew the neighbors would be out of town and that he had been paid to break into the house through a defective sliding glass door. The confessions were admitted into evidence at trial and Elstad was convicted, but this was reversed on appeal in the Oregon state courts.
 {¶ 79} The United States Supreme Court reversed the ruling of the Oregon appellate courts and allowed the post-Miranda confession to be used. Elstad held that, "[i]t is an unwarranted extension ofMiranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, *Page 25 
so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. ThoughMiranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 309.
 {¶ 80} Elstad and Seibert are two opposite ends of the spectrum regarding the admissibility of post-Miranda confessions obtained after there has been a period of unwarned custodial interrogation.Seibert is the more recent case, and thus, controls on matters that disagree with Elstad. These two cases certainly demonstrate that the admissibility of post-Miranda confessions is very fact specific, and each case must be analyzed in the context of the purposes of the Miranda warnings.
 {¶ 81} In our analysis as to whether Appellee's post-Miranda statements are admissible, we must also consider State v. Farris,109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985. The defendant, Stephen F. Farris, was pulled over for speeding. The officer smelled marijuana coming from the car, and told Farris to sit in the front seat of the police cruiser. Without administering Miranda warnings, the officer asked Farris about the marijuana smell. Farris said that his housemates had been smoking marijuana. The officer then told Farris he would be searching the car, and asked if there were any drugs in the car. Farris admitted that there was a marijuana pipe in the trunk. The officer immediately administered Miranda warnings, but did not tell Farris that his previous statements could not be used against him. The officer then asked the same questions again and got the same responses. The *Page 26 
police searched the car and found a marijuana pipe and rolling papers. Farris was charged with misdemeanor possession of drug paraphernalia. After a suppression hearing, the trial court ruled that the post-Miranda confessions were admissible at trial. The Ohio Supreme Court reversed.
 {¶ 82} The overarching concern in Farris was whether the police administered the Miranda warnings in such a way that the suspect understood his Fifth Amendment rights in the context of what was actually occurring: did the suspect understand that he could invoke the right to remain silent at any time and ask for an attorney at any time, regardless of what might have been said in prior interrogations? "The overarching concern when considering the sufficiency of aMiranda warning is whether it is given in a manner that effectuates its purpose of reasonably informing a defendant of his rights." Id. at ¶ 17.
 {¶ 83} Farris deals with a difficult problem arising in "question-first, Mirandize later" scenarios, i.e., whether Miranda warnings will have any significant meaning to the suspect after he or she has already been involved in some kind of interrogation and has already made incriminating statements. As Siebert states:
 {¶ 84} "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function `effectively' as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just *Page 27 
been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." Seibert, 542 U.S. at 611-612, 124 S.Ct. 2601, 159 L.Ed.2d 643.
 {¶ 85} Farris recognized that no clear line can be drawn to decide once and for all how to sever pre-Miranda statements from the post-Miranda statements as that the latter statements are not tainted by the earlier process. Id. at ¶ 22. Each case must be examined in the context of its own specific circumstances.
 {¶ 86} The instant case falls well on the Seibert side of theElstad/Seibert continuum. The police used coercive measures to get Appellee to the police station, and Appellee himself said that he would not have voluntarily gone to the police station except for the fact that they were holding his mother there. The police took him to an interrogation room and berated him for some undetermined amount of time before he made the first comment about "body blows". They stopped the interrogation, read the Miranda warnings, set up the video recorder, and after a short break of 20 minutes or so, started the questioning over again. There was no special explanation about how the prior interrogation affected any subsequent comments Appellee might make. Furthermore, Appellant's attempt to distinguish the types of comments that Appellee made before and after he received his Miranda warnings creates is disingenuous. Appellee was asked specific questions about who struck J.C. both before and after he was given Miranda warnings. Since there was really *Page 28 
only one continuous custodial interrogation, and the interrogation was tainted by the lack of an initial Miranda warning, all statements that Appellee made throughout the interrogation process were correctly suppressed. The trial court's judgment is supported by competent and credible evidence, and this assignment of error is overruled.
 CONCLUSION {¶ 87} Appellant, the State of Ohio, proposed three reasons why the trial court should not have suppressed Appellee's confessions. The state first argues that Appellee was not in custody, and thus, the Miranda rule did not apply. Ample evidence demonstrates, though, that a reasonable person standing in Appellee's shoes would have concluded that he was in custody. The state then argues that no interrogation took place, but the evidence shows, and the trial court found, that the police asked Appellee specific questions about the crime, in a closed room, while screaming curses and threats, veiled or otherwise. This is evidence of an interrogation as defined by Miranda caselaw. Finally, the state argues that any Miranda error was cured after the police administered appropriate warnings, and that statements Appellee made after he was warned are not tainted by the pre-Miranda confession. The police made no effort to clearly demarcate the pre-Miranda interrogation from the post-Miranda session, and failed to explain to Appellee how the privilege against self-incrimination applied to his pre-Miranda confession. Therefore, the trial court was correct that there was only one continuous interrogation, and that all of Appellee's comments both before and after the Miranda *Page 29 
warnings were given must be suppressed. Appellant's arguments are without merit, and the trial court's judgment sustaining Appellee Terrance Tate's motion to suppress is affirmed.
Donofrio, J., concurs.
 Vukovich, J., concurs. *Page 1