[Cite as *State v. Taylor*, 2022-Ohio-614.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                            No. 110596

    v.                                   :

GARY TAYLOR,                            :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 3, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-644330-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brian Kraft, Assistant Prosecuting Attorney, *for appellee.*

James J. Hofelich, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Gary Taylor, appeals from the trial court's judgment, rendered after a jury trial, finding him guilty of aggravated murder, murder, felonious assault, aggravated burglary, aggravated robbery, and theft, and

sentencing him to life in prison with the possibility of parole after 25 years. Finding no merit to the appeal, we affirm Taylor's convictions.

## I. Background

{¶ 2} Taylor was indicted in a multicount indictment as follows: Count 1, aggravated murder in violation of R.C. 2903.01(B); Count 2, murder in violation of R.C. 2903.02(A); Count 3, murder in violation of R.C. 2903.02(B); Count 4, felonious assault in violation of R.C. 2903.11(A)(1); Count 5, aggravated burglary in violation of R.C. 2911.11(A)(1); Count 6, aggravated robbery in violation of R.C. 2911.01(A)(3); and Count 7, theft in violation of R.C. 2913.02(A)(1). Counts 2 through 6 contained notice of prior conviction and repeat violent offender specifications. The charges arose out of the murder of Daniel Donlan. Taylor pleaded not guilty, and the case proceeded to trial.

{¶ 3} Vickie Perry testified that she met Donlan in February 2017, after she responded to his ad on Craigslist for a nurse. Perry testified that their relationship developed into a close friendship, and they would go out to eat and watch TV together at Donlan's home. She said that from March 2017, through January 2018, she would visit Donlan once a week, sometimes spending the night.

{¶ 4} Taylor and his mother, Lydia, lived in an apartment across the street from Donlan. Perry said that she met Taylor the first time she went to Donlan's home when, as she and Donlan were sitting in his car in the driveway, Taylor approached and asked Donlan for $40, which Donlan took from his wallet and gave him. She said that the next time she visited Donlan, she heard knocking at the side

door and heard Donlan talking to Taylor. Perry said that on the days when she would spend the night at Donlan's house, Taylor "would come and go all through the day," sometimes appearing at the side door as late as 2 a.m. She said that Taylor would knock on the side door window, Donlan would go to the door, and she would hear them talking. She said that from March 2017, to January 2018, she saw Taylor at least 20 times when she was at Donlan's home; other times when she was there she would not see him but would hear him at the side door talking to Donlan, asking for money for different reasons. Perry testified that when she learned of Donlan's murder, she thought of Taylor because he had "started getting really aggressive towards Dan."

{¶ 5} Perry said that Donlan showed her a notebook in which he a kept a record of the dates and amounts of money he gave to Taylor, as well as the reason for the loans; she also saw him writing in the notebook after he gave Taylor money. She said that the last time she saw Donlan was on January 15, 2018, and the last time she spoke with him was around 10 a.m. on Saturday, January 27, 2018. She confirmed from state's exhibit No. 1113 — a copy of texts between her and Donlan — that her last text from Donlan was at 5:23 p.m. on January 27, 2018.

{¶ 6} Nancy Sherepita testified that she met Donlan in 2012 on a dating site. Sherepita said that she and Donlan became friends and would travel together and see each other once a week. Sherepita testified that Donlan developed memory issues during the six years she knew him and that he began writing notes for himself in spiral notebooks. She was aware that Donlan would often give Taylor money and

testified that Taylor's requests for money became more frequent as the years passed. She said that "almost every time" she was at Donlan's home, Taylor would knock at the side door and Donlan would give him cash. Nancy said Donlan "would be mad at himself" after loaning the money and then would "write something down" in a notebook.

{¶ 7} Sherepita identified state's exhibit Nos. 1007, 1008, and 1009 as the notebooks Donlan would write in after he loaned money to Taylor; she also identified Donlan's handwriting in the notebooks. In state's exhibit No. 1007, Sherepita identified Donlan's handwritten notes regarding his repeated loans to Taylor in the days immediately prior to his death: "1/25/18 Loaned Lydia $20 and Gary $10"; "1/25/18, Thursday, 4:30 p.m. Gave Gary $10"; "1/25/18, Thursday, 7:22 p.m. Gave Gary $25"; "1/25/18, Thursday, 11:00, Gave Gary $20"; "1/26/18, Friday, 6:46 Gave Gary $40 He is moving in with son"; "1/26/18, Friday 9:40 p.m. Gave Gary $40 for something"; "1/27/18, Saturday 2:30 p.m. Gave Gary $40. He needs room and board." The notebook also reflects that beginning in September 2017, Donlan began writing "That's it," "No more Gary on property," "I have no more," and "No more Gary" when he noted the dates and amounts of money he gave to Taylor.

{¶ 8} Sherepita testified that she and Donlan met for lunch on Saturday, January 27, 2018, at the Outback Steakhouse in Parma, Ohio, and that Donlan was agitated when he arrived. She said their lunch lasted a couple of hours and that based on their conversation during lunch, she told Donlan as they were leaving that

"if Taylor gives you a problem tonight, call the police." The next morning, Sherepita texted Donlan at 8:50 a.m. and told him, "I hope Gary left you alone last night." She said she sent the text because Donlan had been agitated at lunch the day before and she was aware of Taylor's repeated requests "during all hours of the day and night" for money.

{¶ 9} Nicholas Taylor, Taylor's son, testified that as of January 2018, he had been selling crack cocaine to his father several times a month for a few years. He said that Taylor would typically call or text him when he wanted to make a purchase and that he would then drive to Taylor's house to make the sale; he said that Taylor would usually purchase $20 to $40 worth of crack cocaine.

{¶ 10} Nicholas said that Taylor called him around 10:00 p.m. on January 27, 2018, because he wanted to buy $100 of crack cocaine. Nicholas said he drove to the corner of Brown Road and Madison Avenue in Lakewood, and Taylor — who Nicholas said was wearing shorts and a tee-shirt — came out to meet him. Taylor told Nicholas that he was "washing clothes and cooking; he's got to hurry up and go." Surveillance video from the area captured Nicholas's car arriving at the corner of Brown Road and Madison Avenue and Taylor coming out to meet him. When asked if he recalled telling the police that he was "surprised" that his father had $100 that night to buy crack, Nicholas said he did not recall making the statement but that he did not deny making it.

{¶ 11} Dawn Florjanicic, a dispatcher with the Lakewood Police Department, testified that she received a 911 call on Monday, January 29, 2018, from Taylor, who

said he had last seen Donlan on Friday, January 26, and was concerned because he had not seen him for several days.

{¶ 12} Lakewood police officer James Barry was the first officer to respond to Donlan's residence for a welfare check. He said he found the side door unlocked and nothing in the residence appeared to be out of place. After the police found Donlan lying on the floor in the basement with visible head injuries and blood pooled around his head, Officer Barry asked the 911 dispatcher to call Taylor, who lived across the street from Donlan, and ask him to meet Barry at the scene. Footage of Barry's interaction with Taylor was recorded on Barry's body camera (state's exhibit No. 821) and played for the jury. In the video, Taylor told Barry that he had last seen Taylor at 10:30 Friday night when he borrowed $40 from him. Taylor also gave a written statement to Barry that was consistent with what was recorded on the body camera video. Barry testified that he did not observe any visible injuries on Taylor.

{¶ 13} Lakewood police detective James Motylewski testified that he responded to Donlan's residence on January 29, 2018, to photograph the crime scene. Brenda Butler, who was a special agent with the Ohio Bureau of Criminal Investigation at the time, also responded and photographed the scene.

{¶ 14} Det. Motylewski testified about the photographs he took, including photographs of injuries to Donlan's head, blood spatter in close proximity to his body, a circular saw with blood on it on the floor close to Donlan's head, and a partial bloody shoe print "walking away" from Donlan's body toward the basement steps. He said he took pictures of the two receipts found in Donlan's wallet, both dated

January 27, 2018, from Outback Steakhouse, one at 3:26 p.m. and the other at 4:08 p.m. Det. Motylewski said the police did not find any cash in Donlan's wallet. Det. Motylewski also photographed the call and text history on Donlan's cell phone. Donlan's wallet and cell phone were found on the first floor of the residence, not in his pockets.

{¶ 15} Butler testified that the Lakewood Police Department called her on January 29, 2018, to help photograph and process the crime scene. She testified that she collected swabs for potential touch DNA at various locations in Donlan's home. She identified the photographs she took at the scene, including photographs of blood spatter stains on a shelf, a circular saw, a brick, and a shovel found in the basement. She testified that the spatter stains showed "different directionality," which indicated there were multiple impacts that caused the splatter. She also concluded from her observations of Donlan's "narrow and linear" head injuries that the saw could have been used as a weapon. She identified multiple impressions in dried blood in the basement as "consistent with footwear" and concluded that Donlan was not ambulatory after he began bleeding because there was no blood found on the bottom of his shoes. She testified further that the footprints in the basement all had the same consistent pattern.

{¶ 16} Butler testified that she collected various items from the scene for DNA testing, including decorative trim broken off from a window on the side door and found on the stairs leading to the basement, Donlan's eyeglasses found at the

bottom of the basement stairway, and the circular saw and a brick with blood on it found close to his body.

{¶ 17} Lakewood police detective Dave Kappa testified that the police executed a search warrant at Taylor's apartment on January 30, 2018, looking for boots and bloody clothing. He said the police did not find any items of evidentiary value and, although they found various footwear in the apartment, they did not locate any boots that appeared to match those worn by the perpetrator of the murder. Butler testified that she assisted the police with a second search at Taylor's apartment on February 6, 2019, but admitted they found no evidence linking Taylor to Donlan's murder.

{¶ 18} Dr. Erica Armstrong, a forensic pathologist in the Cuyahoga County Medical Examiner's Office, responded to the crime scene and subsequently performed Donlan's autopsy. She concluded that Donlan, who was found lying on the floor on his left side, suffered "blunt force head trauma with skeletal and brain injuries," as well as blunt force injuries to his neck, trunk, and extremities. She classified the manner of death as homicide and, in light of her autopsy findings, concluded that Donlan was murdered between 5:00 p.m. and 10:00 p.m. on Saturday, January 27, 2018.

{¶ 19} Carey Baucher, a DNA forensic scientist in the Cuyahoga County Medical Examiner's Office, performed DNA analysis on the items submitted to her. For comparison, she had DNA samples from Donlan, Taylor, Perry, Sherepita and her four sons, Susan Durkin (Donlan's sister), John Portale (to whom Donlan loaned

a small amount of money), and Contessa Irkalla (another woman Donlan met on Craigslist). With regard to the shirt Donlan was wearing when he was murdered, Baucher testified that the swab taken from the back of the right sleeve, shoulder, and flank of the shirt contained a mixture of DNA that included Donlan and Taylor and excluded the other aforementioned individuals. Likewise, swabs taken from Donlan's front and back right pants pockets contained both Donlan's and Taylor's DNA. Baucher testified that the state's theory that Taylor reached into Donlan's pants pockets was consistent with her finding. She confirmed that Taylor's DNA was not found on Donlan's eyeglasses or in a blood sample taken from the basement wall of Donlan's home and that Donlan's DNA was not found in a blind swab of Taylor's sink taken on February 6, 2019. She said that there was an insufficient quantity of DNA on the circular saw and pieces of window trim from the side door to test, and DNA on the brick found close to Donlan's body was from Donlan.

{¶ 20} Lakewood police officer Justin Clark testified that ten days before Donlan was murdered, he and another officer responded to Taylor's apartment on the afternoon of January 17, 2018, after Lydia (who used to work for the Lakewood Police Department) called the police to complain that Taylor had stolen money from her. Clark said that Taylor met the officers in the vestibule of the apartment building as they arrived. Clark said that the other officer went to speak with Lydia in her apartment while he stayed in the vestibule with Taylor "until we knew more information." Clark testified that while they waited, Taylor discussed his drug addiction with him. Over defense objection, a portion of the footage from Clark's

body camera filmed during his encounter with Taylor was played for the jury, in which Taylor told Clark:

> This s*** is just f***ing completely taken me over, dude. It takes me to a place I don't even want to be at. I'm doing things I wouldn't normally think about doing. I wish I wouldn't have gotten involved in cocaine because it's causing me to do things I wouldn't even dream of doing. It's really, really screwed me up beyond anything whatsoever.

When Clark asked Taylor how often he used, Taylor responded:

> Whenever I can get my hands on money. I go through as much money as I can and connive. I'm not robbing anybody, no strong-arm robberies, no weapons, no s*** like that. I borrow money off people and promise to pay them back and I can't pay them back because all of the money I get I buy the s*** with. So everyone's pretty much disgusted with me. I started using that s*** and started out with $20. Once I start, I'll go to any length to find money to continue to use. It consumes me.

(State's exhibit No. 1021; tr. 879; tr. 1064-1065.)

{¶ 21} The state's final witness was Lakewood police detective Thomas McLaughlin, the lead investigator into Donlan's murder. Det. McLaughlin testified that as a result of the investigation, the police eliminated all suspects other than Taylor. He said that Taylor's name appeared over 500 times in Donlan's notebooks, which dated back two and one-half years from his murder, and that Donlan had loaned Taylor approximately $25,000 during this time period. Det. McLaughlin testified that as of January 2018, neither Taylor nor his mother had a job, and Donlan's telephone records showed that Taylor would call Donlan at all hours of the day and night.

{¶ 22} Det. McLaughlin testified about Donlan's notebook entries reflecting the money he gave to Taylor on January 25, 26, and 27, 2018, which demonstrated

that Donlan gave Taylor money eight times in only three days. He testified further that on January 24, 2018, Donlan made two entries that read, "1/24/18 7 a.m. He's back. Had to give Gary $60. He had three women. Just give him all your money" and "1/24/18 1:46 a.m. Gave Gary $40 for two women. No more Gary." Det. McLaughlin testified that Donlan went to the bank twice on January 27, 2018, and withdrew $100 each time, but the police did not find any cash in Donlan's pants pockets or wallet.

{¶ 23} Det. McLaughlin confirmed that the police executed a search warrant at Taylor's apartment on January 30, 2018, and that although they found other footwear, they did not find any footwear that contained an impression matching the shoe or bootprints left behind in the blood near Donlan's body. He identified state's exhibit No. 1024 as a still image of Taylor taken from the video footage from Officer Clark's body camera during his interaction with Taylor on January 17, 2018. In the photograph, Taylor can be seen wearing a pair of tan boots. Det. McLaughlin confirmed that those boots were not recovered from Taylor's apartment on January 30, 2018, when the police searched the apartment.

{¶ 24} At the close of the state's case, the trial court denied Taylor's Crim.R. 29 motion for acquittal. Taylor presented no witnesses in his defense, and the jury found him guilty of all charges. At sentencing, the trial court merged all counts and

sentenced Taylor on Count 1, aggravated murder, to life in prison with the possibility of parole after 25 years.[1]  This appeal followed.

## II.  Law and Analysis

### A.  Stacking Inferences

{¶ 25} In his first assignment of error, Taylor contends that the state was improperly allowed to introduce evidence that boots matching those worn by him on January 17, 2018, during his interaction with the police, were not recovered from his apartment when the police executed a search warrant there on January 30, 2018, and then argue that because the boots were never found, he disposed of the boots after Donlan's murder to destroy evidence.  Taylor contends that this evidence impermissibly allowed the jury to stack an inference upon an inference in reaching its decision.

{¶ 26} "'A trier of fact may not draw [a]n inference based * * * entirely upon another inference, unsupported by any additional fact or another inference from other facts[.]'"  *State v. Cowans*, 87 Ohio St.3d 68, 78, 717 N.E.2d 298 (1999),

---

[1] Counts 2-6 contained repeat violent offender and notice of a prior conviction specifications.  Prior to trial, defense counsel and the prosecutor agreed that the specifications would be bifurcated and tried to the court.  (Tr. 8-9.) The record contains nothing indicating that the court heard evidence or rendered a verdict on the specifications.  The jury was not instructed on the specifications and did not render a verdict on them.  (Tr. 1015-1050; 1116-1121.)  Nevertheless, the trial court's judgment entries of conviction and sentencing find that the jury rendered a guilty verdict on all specifications.  We decline to address this error because Taylor does not raise it as an assignment of error; it does not present a final, appealable order issue, *State v. Clark*, 8th Dist. Cuyahoga No. 101449, 2014-Ohio-5693, ¶ 11-12; and in any event, because the trial court merged all counts for sentencing into Count 1, Taylor was not prejudiced by the error.

quoting *Hurt v. Charles J. Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph one of the syllabus. "When an inference, which forms the basis of a conviction, is drawn solely from another inference and that inference is not supported by any additional facts or inferences drawn from other established facts, the conviction is improper." *State v. Armstrong*, 11th Dist. Portage No. 2015-A-0001, 2014-Ohio-4304, ¶ 23.

{¶ 27} Though widely denounced by both courts and legal commentators, the rule prohibiting the stacking of one inference upon another is still recognized in Ohio. *Motorists Mut. Ins. Co. v. Hamilton Twp. Trustees*, 28 Ohio St.3d 13, 502 N.E.2d 204 (1986). The rule has very limited application, however. "An inference which is based in part upon another inference and in part upon factual support is called a parallel inference and is universally approved provided it is a reasonable conclusion for the jury to deduce." *Hurt* at paragraph three of the syllabus. The rule also does not prohibit the drawing of multiple inferences separately from the same set of facts. *McDougall v. Glenn Cartage Co.,* 169 Ohio St. 522, 160 N.E.2d 266 (1959), paragraph two of the syllabus. "Because reasonable inferences drawn from the evidence are an essential element of the deductive reasoning process by which most successful claims are proven, the rule against stacking inferences must be strictly limited to inferences drawn exclusively from other inferences." *Donaldson v. N. Trading Co.*, 82 Ohio App.3d 476, 481, 612 N.E.2d 754 (10th Dist.1992).

{¶ 28} We agree that the evidence that Taylor was wearing boots ten days prior to the murder during his interaction with the police on January 17, 2018, and

evidence that those boots were not found by the police in Taylor's apartment after the murder should not have been admitted. Although there was testimony that all the prints in the dried blood in Taylor's basement had the same consistent pattern, Det. McLaughlin acknowledged that the prints could have been shoe prints and not boot prints. (Tr. 895.) Moreover, there was no testimony that the pattern of the shoe or boot prints in the blood matched the pattern on the soles of the boots worn by Taylor ten days before Donlan was murdered. Admission of evidence that Taylor was wearing boots ten days before the murder and that the police never found those boots allowed the jury to impermissibly stack inferences to conclude that he disposed of his bloody boots.

{¶ 29} Nevertheless, the jury could have found Taylor guilty of Donlan's murder, even without concluding that he disposed of his boots. Taylor's DNA evidence on Donlan's shirt and right pants pockets, combined with his admission that he constantly needed money to feed his crack cocaine addiction, Donlan's notations in his notebooks that he was not going to give Taylor any more money, Donlan's withdrawal of $200 from an ATM the day he was murdered, the pathologist's conclusion that Donlan was killed between 5:00 p.m. and 10:00 p.m. on January 27, Taylor's purchase of $100 of cocaine from his son around 10:00 p.m. on January 27 — an amount more than he usually bought — and his statement to his son that he had to hurry because he was "washing clothes" were all circumstantial evidence from which the jury could have reasonably concluded that Taylor killed Donlan to steal money from him for cocaine. Taylor's presumed disposal of his

bloody boots was merely additional circumstantial evidence of his guilt; it was not necessary for the jury to reach a guilty verdict. Accordingly, despite the improper admission of the evidence regarding the missing boots and the impermissible inference stacking regarding Taylor's alleged disposal of his bloody boots, he was not prejudiced by the errors. Any error was harmless error.

{¶ 30} The first assignment of error is therefore overruled.

## B. Other Acts Evidence

{¶ 31} In his second assignment of error, Taylor contends that the trial court erred by admitting evidence of his other bad acts in violation of Evid.R. 404(B). Specifically, he objects to the portion of the video footage from Officer Clark's body camera during Clark's interaction with Taylor on January 17, 2018, during which Taylor told Clark that he had a crack cocaine addiction and would "go to any length to find money to continue to use."

{¶ 32} "The admission of other-acts evidence under Evid.R. 404(B) 'lies within the broad discretion of a trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice.'" *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 96, quoting *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.

{¶ 33} "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad

character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 12778, ¶ 15; Evid.R. 403(A). Nevertheless, Evid.R. 404(B) allows evidence of the defendant's other crimes, wrongs, or acts to be admitted "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Hence, "the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." *Williams* at ¶ 17.

{¶ 34} In deciding whether to admit other acts evidence, trial courts should conduct a three-step analysis:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Evid.R. 403.

*Id.* at ¶ 20.

{¶ 35} The state's theory of the case was that when Donlan finally told Taylor on January 27, 2018, that he would not give him any more money, Taylor became angry, pushed him down the basement steps, and then, in a fit of anger, killed him with a blunt object (the saw or brick) to steal money to buy drugs. Thus, considering the first step of the three-step analysis, we find Taylor's statements to Clark on January 17, 2018, that he had an overwhelming crack addiction and constantly

needed money to feed his addiction relevant to establishing his motive for killing Donlan.

{¶ 36} Regarding the second step — whether evidence was presented to prove the accused's character in order to show the conduct was in conformity with that character — the state did not offer Taylor's statements to show that Donlan's murder was in conformity with Taylor's bad character; it offered the statements to prove Taylor's motive for killing Donlan. Motive is a legitimate purpose under Evid.R. 404(B) for admitting other acts evidence.

{¶ 37} Taylor contends that the evidence was presented only to show his bad character, however, because the police were at his apartment on January 17, 2018, in response to a call from his mother that he had stolen money from her, and "it is difficult to see how stealing from one's mom would be relevant evidence in a murder case where the victim is not one's mom." Taylor misses the point. As stated above, the evidence was presented to show his motive for killing Donlan, not his theft from his mother. Moreover, the jury did not see the entire footage of Taylor's interaction with Officer Clark on January 17, 2018; it saw only a two and one-half minute portion where Taylor told the officer about his crack addiction and constant need for money to support that addiction. The jury was not made aware that Taylor's mother had called the police to complain that he had stolen money from her. (Tr. 879.)

{¶ 38} Finally, with regard to the third step of analysis, the proffered evidence was not more prejudicial than probative. "The probative value of the

evidence, as well as whether any prejudice is unfair, will generally depend on the degree to which the fact [to be proved by way of the other acts evidence] is actually contested." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 31. "As the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of unfair prejudice decreases." *Id.*

{¶ 39} Whether Taylor had a motive for killing Donlan was obviously a disputed issue at trial. Indeed, Taylor argues on appeal that "he did not need to steal from Donlan" because Donlan gave him money "all the time." The state, on the other hand, argued at trial that Donlan finally told Taylor on January 27, 2018, that he would not give him any more money, which made Taylor angry and motivated him to kill Donlan so he could steal money from him to support his drug addiction. Because Taylor's motive for Donlan's murder was disputed, and because his statements to Officer Clark are highly probative of his motive, we find that the probative value of the statements was not outweighed by the danger of unfair prejudice.

{¶ 40} The second assignment of error is overruled.

## C. Motion to Suppress

{¶ 41} Prior to trial, Taylor filed a motion to suppress the statements he made to Officer Clark on January 17, 2018. In his third assignment of error, Taylor contends that the trial court erred in denying the motion because he was in custody

when the statements were made and the police did not give him any *Miranda* warning.

{¶ 42} Appellate review of the denial of a motion to suppress involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. The trial judge acts as the trier of fact and, as such, is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence. *State v. Guysinger*, 86 Ohio App.3d 592, 594, 621 N.E.2 726 (4th Dist.1993). Accepting these facts as true, the appellate court independently reviews the trial court's legal determinations de novo. *State v. Djisheff*, 11th Dist. Trumbull No. 2005-T-0001, 2006-Ohio-6201, ¶ 19.

{¶ 43} In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that custodial interrogations have the potential to undermine the Fifth Amendment privilege against self-incrimination by possibly exposing a suspect to physical or psychological coercion. *Id.* at 436. To guard against such coercion, the court established a prophylactic procedural mechanism that requires that a suspect receive a warning before custodial interrogation commences. *Id.* at 444. Suspects in custody must be warned, among other things, that they have a right to remain silent and that their statements may be used against them at trial.

{¶ 44} The Supreme Court has defined the term "custody" as the deprivation of "freedom of action in any significant way." *Id.* A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the encounter and leave. *Yarborough v. Alvarado,* 541 U.S. 652, 663-665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *State v. Martinez,* 8th Dist. Cuyahoga Nos. 103572 and 103575, 2016-Ohio-5515, ¶ 20. "The 'ultimate inquiry when determining whether an individual is in 'custody' for *Miranda* purposes is 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* at ¶ 24, citing *State v. Duhamel,* 8th Dist. Cuyahoga No. 102346, 2015-Ohio-3145, ¶ 22, quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). "Where a defendant has not been placed under arrest, there must be some objective, 'affirmative signs of coercion' or restraint to transform a police interview into a 'custodial' interrogation." *Martinez* at ¶ 24, citing *State v. Griffith,* 8th Dist. Cuyahoga No. 97366, 2012-Ohio-2628, ¶ 20.

{¶ 45} We find no such objective signs of coercion or restraint by the police during Taylor's conversation with Officer Clark. The body camera footage demonstrates that Taylor came up the stairs as the police entered the apartment building and began speaking with them in the vestibule of the building. When Taylor volunteered that he had stolen $340 from his mother because he had a cocaine addiction and that he was ready to go to jail, one of the officers told Taylor that he knew his mother because she used to work at the Lakewood Police

Department and that Taylor should wait in the vestibule while the officer spoke with her to find out if she planned to press charges.

{¶ 46} As that officer spoke with Lydia, Officer Clark stayed in the vestibule with Taylor, who moved about the vestibule area freely, looking out the window, opening the door at one point to let another person in the building, and sitting down on the steps at another point during the conversation. Taylor was never handcuffed, restrained, threatened, or told that he was under arrest and could not leave, nor did he ever attempt to leave. Officers Clark and Taylor engaged in a conversation about his crack addiction, during which Taylor volunteered the information about what the addiction was doing to him and his need to constantly have money to feed the addiction. The entire encounter lasted less than one-half hour.

{¶ 47} Considering the totality of the circumstances, we find nothing objectively coercive about the atmosphere such that it turned into a custodial interrogation at which the police were required to give Taylor his *Miranda* warnings. Taylor was not handcuffed, his movement was not restrained, he was never told that he could not leave, and he did not ever ask to leave or end the brief encounter. *See, e.g.*, *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 20 (8th Dist.) (no custodial interrogation where the defendant invited officers into her home where the questioning took place, officers did not handcuff or restrain the defendant, and defendant never made an attempt to end the interview); *Griffith*, 8th Dist. Cuyahoga No. 97366, 2012-Ohio-2628, at ¶ 20 (officers' questioning of defendant at friend's home "had none of the hallmarks of a custodial interrogation"

where defendant was not handcuffed, was not separated from the owner of the home during questioning, and questioning lasted less than one-half hour); *Compare State v. Tate*, 7th Dist. Mahoning No. 07 MA 130, 2008-Ohio-3245, ¶ 57-68, 72 (notwithstanding officers' statements to defendant that he was not a suspect, was not under arrest and was free to leave, defendant was subject to custodial interrogation where, during interview at the police station, police officers were verbally abusive and physically intimidating, i.e., screaming and cussing at defendant; calling him a liar and shaking a finger at him; threatening him with arrest and prison; and telling him that his mother was being held in informal custody until he gave the police certain answers to their questions).

{¶ 48} Despite Taylor's argument otherwise, simply because he admitted that he had stolen money from his mother and was "ready to go to jail" did not turn the encounter into a custodial interrogation. "*Miranda* warnings are not required simply because someone is a suspect." *Martinez*, 8th Dist. Cuyahoga Nos. 103572 and 103575, 2016-Ohio-5515, at ¶ 22, citing *State v. Petrtiashvili*, 8th Dist. Cuyahoga No. 92851, 2009-Ohio-6466, ¶ 16; *see also State v. Boyd*, 4th Dist. Adams No. 02CA744, 2003-Ohio-983, ¶ 7-8 ("[L]aw enforcement officers are not required to administer *Miranda* warnings to every person suspected in an investigation.* * * The mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in non-custodial settings.") Taylor was not in custody during his encounter with the police, despite his admission to the theft.

{¶ 49} Moreover, the video footage reflects that Taylor volunteered the information about his addiction to crack cocaine and his constant need for money to feed his addiction. "*Miranda* does not affect the admissibility of 'volunteered statements of any kind.'" *State v. McGuire*, 80 Ohio St.3d 390, 501, 686 N.E.2d 1112 (1997), quoting *Miranda*, 384 U.S. 436 at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 50} Accordingly, the trial court did not err in denying the motion to suppress, and the third assignment of error is overruled.

## D. Sufficiency of the Evidence

{¶ 51} Taylor next contends that there was insufficient evidence to support his convictions.

{¶ 52} When reviewing a challenge to the sufficiency of the evidence, we examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus.

{¶ 53} A sufficiency challenge requires us to review the record to determine whether the state presented evidence on each element of the offense. This test involves a question of law and does not allow us to weigh the evidence. *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 6, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 54} Taylor was convicted in Count 1 of aggravated murder in violation of R.C. 2903.01(B), i.e., purposely causing Donlan's death while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit the offense of aggravated burglary in violation of R.C. 2911.11(A)(1) and/or aggravated robbery in violation of R.C. 2911.01(A)(3).

{¶ 55} R.C. 2911.01(A)(3), regarding aggravated robbery, provides that "[n]o person, in attempting or committing a theft offense, or in fleeing immediately after the attempt or offense, shall inflict or attempt to inflict, serious physical harm to another." R.C. 2911.11(A)(1), regarding aggravated burglary, provides that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * the offender inflicts, attempts, or threatens to inflict physical harm on another."

{¶ 56} At trial, the state introduced evidence that Taylor lived across the street from Donlan, and that in the several years prior to Donlan's murder, Taylor had developed an addiction to crack cocaine, for which he constantly needed money. The state also presented evidence that, as demonstrated by Donlan's notebooks, in the two and one-half years prior to the murder, Donlan had loaned Taylor over $25,000. The state also presented evidence that Taylor harassed Donlan for money almost every day, sometimes several times in a single day, and that before the murder, he had become "really aggressive" toward Donlan with his repeated

requests for money. The state also presented evidence that Donlan had decided not to give Taylor any more money.

{¶ 57} The state's evidence established that Taylor called 911 on Monday, January 29, 2018, to report his concern that he had not seen Donlan for several days. Taylor told the 911 dispatcher that he had last seen Donlan on Friday, January 26, but the evidence established that Taylor's statement was not true because Donlan's notebook reflected that Donlan had given Taylor $40 on Saturday, January 27, 2018, at 2:30 p.m.

{¶ 58} The state presented evidence that when the police arrived at Donlan's home the morning of January 29, 2018, they found the side door unlocked but partially damaged. They found Donlan in the basement of his home, lying on his left side, with blood pooling around his head and severe head injuries due to multiple impacts from a blunt object. Donlan's right pants pockets were exposed and shoe or bootprints were visible in the dried blood on the floor; the prints led away from the body to the basement stairs and were apparently from the murderer. The state presented evidence that although Taylor was in possession of a pair of tan boots ten days prior to Donlan's murder, the boots were not found when the police executed a search of Taylor's apartment on Monday, January 29, 2018.

{¶ 59} The state presented evidence that Donlan had withdrawn $200 from an ATM on Saturday, January 27, but that no cash was found in his pants pockets or in his wallet. The state also presented evidence that Taylor's DNA was found on the shirt Donlan was wearing when he was murdered and on Donlan's right pants

pockets. The state presented evidence that the presence of Taylor's DNA on Donlan's right pants pockets was consistent with the state's theory that Taylor reached into Donlan's pockets to take his money.

{¶ 60} The state also presented evidence that Taylor purchased $100 of crack cocaine from his son, Nicholas, a little after 10:00 p.m. on Saturday, January 27, 2018. Nicholas testified that he had been supplying Taylor with crack cocaine for the last few years, and that although Taylor usually only purchased $20 or $40 worth, on that night he purchased $100 worth. Nicholas said he was "surprised" that Taylor had $100 that night to buy crack. Nicholas also said that Taylor was wearing shorts and a tee-shirt and told him that he had to hurry because he was "washing clothes."

{¶ 61} Finally, the state presented evidence that other than Taylor, the other individuals involved in Donlan's life were eliminated as suspects in his murder.

{¶ 62} It is apparent that the state's evidence implicating Taylor in Donlan's murder was solely circumstantial evidence. "Proof of guilt may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Zadar*, 8th Dist. Cuyahoga No. 94698, 2011-Ohio-1060, ¶ 18, citing *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). Direct evidence exists when "a witness testified about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047,

¶ 13. In contrast, "circumstantial evidence requires the drawing of inferences that are reasonably permitted by the evidence." *Id.*

{¶ 63} Circumstantial evidence carries the same weight as direct evidence. *Id.* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). Because "circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned, all that is required of the jury is that it weigh all of the evidence, direct and circumstantial, against the standard of proof beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 at 272, 574 N.E.2d 492.

{¶ 64} "A verdict will not be disturbed based upon a claim of insufficient evidence unless it is apparent that reasonable minds could not come to the conclusion reached by the trier of fact." *State v. Hawthorne,* 8th Dist. Cuyahoga No. 96496, 2011-Ohio-6078, ¶ 9, citing *Treesh* at 484. Here, construing the state's evidence in a light most favorable to the prosecution, we cannot say that reasonable minds could not come to the conclusion reached by the trier of fact, i.e., that Taylor brutally murdered Donlan when Donlan told him he would not give him any more money, and then stole the cash in Donlan's pockets so he could buy crack cocaine. Accordingly, we conclude that the state's evidence, albeit circumstantial, was sufficient to prove each element of the offense of aggravated murder as set forth in Count 1 of the indictment.

{¶ 65} We need not address Taylor's challenge to the sufficiency of the evidence on the other counts. At sentencing, the trial court found that all the counts

merged, and the state elected to have Taylor sentenced on Count 1. "When counts in an indictment are allied offenses, and there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless." *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14.

{¶ 66} The fourth assignment of error is overruled.

**E. Manifest Weight of the Evidence**

{¶ 67} Last, Taylor contends that his convictions were against the manifest weight of the evidence.

{¶ 68} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 32. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). An appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances where the evidence presented at trial weighs heavily against the conviction. *Id.* at 388.

{¶ 69} Taylor contends that his convictions were based heavily on the DNA found in the basement of Donlan's home. He argues that the DNA was not dispositive of his guilt, however, because his DNA was found on Donlan's pants and shirt only because Donlan gave him money at 2:30 p.m. on the day of the murder, before Donlan had lunch with Sherepita. He also contends that there was an unknown contributor to the DNA sample taken from Donlan's eyeglasses, his shirt, and a blood sample from the basement wall, and that unknown person was the murderer.

{¶ 70} We are not persuaded. Carey Baucher, the forensic scientist who performed the DNA analysis, testified that she could not confirm that the unknown contributor to the DNA found on Donlan's eyeglasses, the front of his shirt, and the blood swab from the basement wall was from the same person. (Tr. 708.) Baucher also testified that the DNA found on Donlan's pants pockets was consistent with Taylor actually reaching into Donlan's pockets, something not likely to have happened when Donlan gave Taylor money on Saturday afternoon. Moreover, the other evidence, albeit circumstantial, when viewed in its entirety, gives rise to the reasonable inference that Taylor became angry and killed Donlan when Donlan told him he would no longer give him money.

{¶ 71} Taylor's conviction for aggravated murder is not against the manifest weight of the evidence. As with our sufficiency analysis, because all the counts merged for sentencing, this court need not consider any manifest weight challenge to Taylor's convictions on the other counts. *State v. Worley,* 8th Dist. Cuyahoga No.

103105, 2016-Ohio-2722, ¶ 23 (finding the aggravated murder conviction not against the manifest weight of the evidence rendered any issue with the merged offenses to be harmless error because defendant's final sentence would not be affected by any review of the evidence underlying the merged counts). The fifth assignment of error is overruled.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

SEAN C. GALLAGHER, A.J., and
EILEEN T. GALLAGHER, J., CONCUR